# IN THE UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
# ROANOKE DIVISION

| | | |
|---|---|---|
| ANTHONY HALL, | ) | Civil Action No. 7:19CV00869 |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| MRS. D. DAMERON, | ) | By: Norman K. Moon |
|     Defendant. | ) | Senior United States District Judge |

Anthony Hall, a Virginia inmate proceeding *pro se*, filed this civil rights action pursuant to 42 U.S.C. § 1983. In it, he names a single defendant: Mrs. D. Dameron, who he describes as the "head nurse" at Augusta Correctional Center ("ACC"). His complaint alleges that Dameron violated his Eighth Amendment rights by "denying and delaying to provide adequate medical care" for his serious medical need, a condition of the scalp, or by failing "to carry out a prescribed plan of treatment." (Compl. 1, Dkt. No. 1-1.)[1]

Dameron has filed a motion for summary judgment (Dkt. No. 14), to which Hall has responded (Dkt. No. 17). For the reasons set forth herein, I will grant Dameron's motion. All other pending motions, including motions by Hall for preliminary injunctive relief, will be denied.[2]

## I. BACKGROUND

In his verified complaint, Hall alleges that he has suffered from a serious scalp disease since September 2017 that has spread and worsened "for three years." He claims that his scalp

---

[1] Hall's complaint also references a Fourteenth Amendment violation, but "[t]he Due Process Clause of the Fourteenth Amendment governs a pretrial detainee's claim of denial of medical care." *Hall v. Holsmith*, 340 F. App'x 944, 946 (4th Cir. 2009) (citing *Martin v. Gentile*, 849 F.2d 863, 870 (4th Cir. 1998)). The Eighth Amendment applies to similar claims by convicted prisoners like Hall. *See id.* at 946–47. To the extent he is alleging an Equal Protection claim, *see* Dkt. No. 26 at 6, he has not set forth facts to support such a claim.

[2] *See US Airline Pilots Ass'n v. AWAPPA, LLC*, 615 F.3d 312, 320–21 (4th Cir. 2010) (affirming the district court's denial of a motion for preliminary injunction where the court properly granted a motion to dismiss).

condition is "constantly hurting," is sore, swollen, bleeding, and drains pus. (Compl. ¶¶ 4, 9.)

Hall alleges that Dameron and her agents, employees, and others in "concert with her only provided antibiotic medicine for three years." (*Id.* ¶ 4.) He claims that the treatment did not cure the scalp infection and instead caused his health to deteriorate. (*Id.*) He also alleges, without supporting details or dates,[3] that Dameron "fail[ed] to carry out" his doctors' orders by altering or tampering with either his prescriptions or the doctors' prescribed plan of treatment for him. (*Id.* ¶ 5.) He also claims that he has been unable to get regular haircuts because of his disease and that Dameron has denied him "medical hair clippers."[4] (*Id.* ¶ 11.) He asserts that she had no authorization to interfere with or fail to carry out his physician's orders, that she knew a substantial risk of serious harm would result from her actions, and that she disregarded that risk. (*Id.* ¶¶ 6-8.) In addition to his complaint, he filed with a significant number of grievance documents (both filed by him and responses to his grievances) concerning these issues.

Dameron's motion for summary judgment includes her affidavit and also includes Hall's medical records and medical-related grievances. Hall's opposition, which is verified and so which I treat as an affidavit in opposition to the motion, begins with a focus on legal arguments, some of which are irrelevant to the issues raised in Dameron's summary judgment motion.[5] Hall then lists what he contends are disputes of fact precluding summary judgment.

---

[3] Although not in his complaint itself, Hall later submitted what has been docketed as "additional evidence" and appear to be documents related to Hall's grievances about his medical care. These documents help to fill in some of the dates as to when Hall complained about an alleged lack of treatment.

[4] Neither party addressed the clipper claim expressly in their summary judgment filings. The response to Hall's grievance on the issue, however, indicates that he is permitted to get his hair cut monthly by the barber, but will have "dedicated clippers" in the barbershop. (*See, e.g.*, Dkt. No. 15-3 at 2.) Hall offers no evidence to contradict this, and I do not address the claim further.

[5] For example, Hall presents arguments as to why Dameron is not entitled to qualified immunity, but Dameron does not seek summary judgment on the grounds of qualified immunity.

Many of Hall's "disputes facts," however, are not disputes at all. For example, the first four paragraphs simply summarize some of his medical visits and do not contradict what is reflected in the medical records or Dameron's affidavit. Many others are simply general or conclusory assertions, but do not dispute any of the *facts* in Dameron's affidavit or Hall's medical records.[6] For example, Hall's opposition states that, because of grievances and complaints to Dameron, she is well aware of his medical condition, but she "continues to ignore" his problems and to deny him medical attention. (*Id.* ¶ 11.) He also states that Dameron "has not coordinated any" offsite health appointments for Hall's serious needs, a claim that is flatly contradicted by the medical records.

Taking the factual matters set forth in Dameron's affidavit, Hall's opposition, and Hall's medical records, the undisputed facts reflect that Hall suffers from folliculitis of the scalp and has been treated by numerous providers over the past few years for this condition and others, including Hepatitis C and prostate cancer. (Dameron Aff. ¶ 6.) Hall has received ongoing treatment for his scalp condition, including being seen by a several different outside specialists, over a span of years. Dameron's involvement in his treatment primarily has been to coordinate his outside appointments, and she also has responded to his grievances. (Dameron Aff. ¶ 5.)

Dameron believes that the first time she saw Hall for complaints related to his folliculitis was on January 9, 2018. (Dameron Aff. ¶ 7.) By that time, he had already been referred to an external dermatologist, and was returning to ACC from an appointment with that doctor. (*Id.*; Pl.'s Opp'n ¶ 1.) Pursuant to the dermatologist's recommendations, Dr. Landauer, a physician at

---

[6] As discussed in more detail below, these conclusory assertions are insufficient to create a dispute of material fact. *See Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 875 (4th Cir. 1992) "[U]nsupported speculation is not sufficient to defeat a summary judgment motion.") (citation omitted).

ACC, prescribed doxycycline (an antibiotic) and clobetasol (a topical corticosteroid). (Dameron Aff. ¶ 7.)

Hall had several additional visits with the dermatologist, Dr. Kristen Savola, after January 9, 2018. (Dameron Aff. ¶ 8). On May 21, 2018, Dr. Savola administered a steroid injection into Hall's scalp, recommended antibiotic medicine for 90 days, and also suggested the possibility of a surgical procedure to treat the folliculitis. (Pl.'s Opp'n ¶ 2.) Dr. Savola also noted Hall's interest in this surgical option and stated that she would follow up with a local surgeon. (*Id.*; Dameron Aff. ¶ 8.) In the meantime, Dr. Savola ordered Hall to continue using clobetasol topical cream as needed. (Dameron Aff. ¶ 8; *see also* Med. R. 2–6, 66, Dkt. No. 15-2.)

On July 11, 2018, apparently pursuant to Dr. Savola's referral, Hall was taken to see Dr. Andres, a general surgeon at Augusta Health Hospital. According to Hall, Dr. Andres's assessment was that "[i]t would be a large defect that would not be able to be closed primarily and would require some type of flap or grafting." Dr. Andres referred Hall for an evaluation by a plastic surgeon and to obtain a plastic surgeon's input. (Pl.'s Opp'n ¶ 3, Dkt. No. 17.)

On August 28, 2018, Plaintiff was evaluated by an outside plastic surgeon. The surgeon concluded that surgery was not the best option at the time because Hall had not exhausted all medical options and surgery would be a complex undertaking. (Dameron Aff. ¶ 8; *see also* Med. R. 72–73.) Specifically, the plastic surgeon wanted Hall "to undergo at least 6 months of consistent medical therapy prior to consideration of more invasive options." (Med. R. 72.) Notably—and despite Hall's apparent belief that surgery is his best treatment option—the plastic surgeon described it as a "last resort" with no guarantee of success. (Med. R. 72 (describing informing Hall that "surgical options would likely require a multistage excision process with still

4

high potential for recurrence and poor aesthetic result with high risk of poor wound healing"); Med. R. 73 (again noting the high risk of recurrence in the scalp after surgery). She also prescribed several specific medications for him. (Med. R. 68; *see also* Pl's Opp'n ¶ 4.)

Aside from his repeated assertions that Dameron was deliberately indifferent, the primary specific allegation that Hall levies against Dameron focuses on her actions in response to the plastic surgeon's recommendation. Specifically, Dameron states that the surgeon recommended evaluation by a dermatologist in Charlottesville for medical management options. (*Id.*) In his opposition, Hall claims that the surgeon was "clearly requiring" for Hall to return to Dr. Savola. (Pl.'s Opp'n ¶ 6.) Thus, he argues that when Dameron made an appointment with a Charlottesville dermatologist, she was "ignoring" the plastic surgeon's orders.

The medical records from the August 28, 2018 visit to the plastic surgeon clearly reflect, however, that Dameron followed the precise course of action recommended by the plastic surgeon. In her report, the surgeon recommended "evaluation *by UVA dermatology* for their opinion on medical management options." (Med. R. 72, Dkt. No. 15-2 (emphasis added).) UVA dermatology is located in Charlottesville, and Dameron subsequently made an appointment for Hall with UVA dermatology. Thus, Dameron did not ignore the plastic surgeon's recommendation; she followed it precisely.

On October 16, 2018, Plaintiff was evaluated by the dermatologist in Charlottesville. This dermatologist recommended a different antibiotic course for several months, followed by Humira (an immunosuppressant used for multiple purposes) or other options to include Accutane. The dermatologist advised that because Humira is an immunosuppressant, Plaintiff would need to be free of Hepatitis C, among other conditions. (Dameron Aff. ¶ 8; *see also* Med. R. 91–92.) Hall avers that the UVA dermatologist simply prescribed that he take "antibiotics

5

medicine for six months which didn't improve or cure plaintiff's scalp condition." (Pl.'s Opp'n ¶ 6.)

Dameron's affidavit does not indicate what occurred between Hall's October 2018 appointment and April 2019, although his medical records reflect that he was seen again in January 2019 by UVA dermatology, who again recommended the possibility of Accutane or Humira, but warned that the safety of taking either need to be evaluated based on his whether he had Hepatitis C and based on his blood work. (Med. R. 87.) The dermatologist requested Hall return within three months, and days later, Dr. Smith, the ACC physician submitted a utilization management request, asking for approval for a three-month follow-up appointment with the dermatologist, which was approved. (Med. R. 88.)

In April 2019, Plaintiff was diagnosed with prostate cancer. (Dameron Aff. ¶ 9). Over the next several months, he began seeing a urologist and received various diagnostic tests and treatment interventions for prostate cancer. (*Id.*) Humira was not initiated for his scalp condition during this time due to his Hepatitis C and his ongoing cancer treatment. (*Id.*) On February 9, 2020 (which was after Hall filed this lawsuit in December 2019), a physician at ACC submitted a utilization management request for Mr. Hall to be seen for a follow-up appointment by the dermatologist for the possible start of Humira. (Dameron Aff. ¶ 10). On February 11, 2020, Nurse Dameron informed Hall in a written response to a grievance that his medical records had been sent to VCU Hepatology and that the dermatologist and the ACC physician were working together to determine the appropriate course for his multiple comorbidities. (Dameron Aff. ¶ 11).

In separate motions Hall has filed continuing to seek treatment, he continues to request that he be given specific care, and he contends that his scalp condition has continued to worsen

since filing this lawsuit. (*See, e.g.*, Dkt. No. 23.) He also disputes statements made in affidavits submitted by Dameron in response to his requests for preliminary injunctive relief. In particular, he notes that one of Dameron's affidavits stated that Hall had appointments scheduled in mid-April 2020 and in June 2020 to address treatment for his Hepatitis C and his scalp, respectively, (Dkt. No. 18-1), but he contends that those appointments never occurred. He accuses VDOC generally of using ineffective antibiotics and doing so because it is easier or cheaper than "providing the medical . . . treatment recommended by specialists." (Dkt. No. 23 at 5.)

The court ordered Dameron to respond to these allegations concerning his 2020 appointments. In her response, Dameron notes that she was out on maternity leave from March 25, 2020 until June 15, 2020 and so has no personal knowledge of events that transpired during that time. (Dameron Third Aff. ¶ 2, Dkt. No. 25-1.) Based on Hall's medical records, though, she explained that because he has Hepatitis B in addition to Hepatitis C, he needed to be seen by a hepatologist at VCU, rather than the VDOC hepatologist he was scheduled with in mid-April. (*Id.* ¶¶ 1, 3 (citing Hall Med. R. 191, 194, attached as Dkt. No 25-2).) With regard to Hall's June 2020 dermatology appointment, Dameron explains that, on the date Hall's visit was to occur—telephonically, because of the COVID pandemic—Dr. Savola terminated her physician-patient relationship with Hall, and stated that she did not believe Hall was an appropriate patient for her practice. (Dameron Third Aff. ¶ 4 (citing Hall Med. R. 192–93).) Accordingly, ACC physician Dr. Smith submitted a utilization management request for Mr. Hall to be seen by a UVA dermatologist, and, as of mid-July, arrangements were being made for that appointment. (*Id.* (citing Hall Med. R. 195–96).) Dameron further averred that Dr. Smith is prescribing several medications for Hall to manage his dissecting cellulitis, including topical and oral antibiotics, a topical antiseptic, and a non-steroidal anti-inflammatory medication. (*Id.* ¶ 6.)

Hall does not dispute these occurrences with any personal knowledge to the contrary. In any event, nothing about the rescheduling of any of these appointments can be blamed on Dameron, who was on leave at the time they were scheduled and then rescheduled. Thus, these subsequent events do not defeat Dameron's motion for summary judgment.[7]

## II. DISCUSSION

### A. Summary Judgment Standard

Under Rule 56, summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists only where the record, taken as a whole, could lead a reasonable jury to return a verdict in favor of the nonmoving party. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009). In making that determination, I must take "the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc).

A party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Moreover, "[t]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id.* at 247–48. Instead, the non-moving party must produce "significantly probative" evidence from which a reasonable jury could return

---

[7] Hall's opposition also claims that neither Dameron nor any prison physician has permitted him to be housed in the medical infirmary or a single-cell in general population, and he claims that "for several months" no one has provided a "thorough examination of him" to decide if single-cell placement is appropriate. (Pl.'s Opp'n ¶ 12.) Relatedly, he claims that unspecified officers have told him that "[i]t's a shame" with regard to his housing and also have offered their opinions that Hall needs better medical care or to be placed in a medical facility. (*Id.*) Setting aside the issue that Hall does not identify who allegedly said this or when, nor provide an affidavit from any person on this subject, it is irrelevant to the issue of whether Dameron was deliberately indifferent. This housing issue is not referenced in the complaint and was not addressed in the summary judgment motion. Moreover, Hall does not put forward any facts to show that Dameron had any input into, or control over, his housing assignments.

a verdict in his favor. *Abcor Corp. v. AM Int'l, Inc.*, 916 F.2d 924, 930 (4th Cir. 1990) (quoting *Anderson*, 477 U.S. at 249–50).

## B. Eighth Amendment Claim—Deliberate Indifference to Medical Need

"It is beyond debate that a prison official's deliberate indifference to an inmate's serious medical needs constitutes cruel and unusual punishment under the Eighth Amendment." *Gordon v. Schilling*, 937 F.3d 348, 356 (4th Cir. 2019). To demonstrate deliberate indifference, an inmate must show that (1) he has a medical condition that has been "diagnosed by a physician as mandating treatment or is so obvious that even a lay person would easily recognize the necessity for a doctor's attention" and (2) the defendant "had actual knowledge of the plaintiff's serious medical needs and the related risks, but nevertheless disregarded them." *Id.* at 356–57; *Estelle v. Gamble*, 429 U.S. 97, 105 (1976). The first component is an objective inquiry and the second is subjective. *Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 209–10 (4th Cir. 2017).

Dameron does not dispute that Hall's folliculitis is a serious medical condition. She contends, though, that Hall has not set forth any evidence to show that she was deliberately indifferent to his needs. She points to the medical records and Hall's medical treatment as showing that she was not deliberately indifferent. Based on the undisputed facts, I agree.

Dameron avers that, as an RN and HSA, she cannot and does not order medications. (Dameron Aff. ¶ 12). Thus, she has no part in the decisions to prescribe (or not prescribe) medications for Hall's folliculitis or Hepatitis C. Nor does Dameron determine when and to what extent Hall might qualify for more invasive or aggressive treatment of folliculitis and/or Hepatitis C. (Dameron Aff. ¶ 13.) These facts are not disputed by Hall. Thus, although many of Hall's statements indicate his belief that surgery should be ordered for his scalp, Dameron does not play a role in deciding whether or not he should have surgery.

9

Instead, Dameron's primary role has been to refer Hall to the ACC physician and to coordinate his care among various providers, including making appointments at outside providers. In his opposition, aside from the one accusation concerning the plastic surgeon's referral, which is unsupported by the medical records as already noted, Hall does not point to any date on which Dameron did something or failed to do something with regard to his treatment, or any specific action taken by her that he believes shows deliberate indifference. As already discussed, he simply makes general assertions that she has failed to treat him or to follow doctor's orders, which are insufficient to defeat summary judgment.[8] *See Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 875 (4th Cir. 1992) "[U]nsupported speculation is not sufficient to defeat a summary judgment motion.") (citation omitted).

Moreover, deliberate indifference requires more than mere negligence or malpractice. *See Estelle*, 429 U.S. at 106. Instead, the defendant's conduct must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness. *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990), *overruled in part on other grounds by Farmer v. Brennan*, 511 U.S. 825, 837 (1994). In sum, and in light of the facts in the record, no reasonable jury could conclude that Dameron was deliberately indifferent to Hall's medical needs.

---

[8] For her part, Dameron flatly denies the more general allegations against her. She avers, for example, that she has not interfered or tampered with or failed to carry out the treatment plans of any of his physicians, that she has responded promptly to his medical-related grievances and always listened to Hall's concerns and taken them seriously, and that she has never been deliberately indifferent to any of Mr. Hall's medical needs. (Dameron Aff. ¶ 15). Addressing these issues on a very general level, then, the parties dispute whether she was deliberately indifferent, but those disputes are not disputes of *fact* that preclude summary judgment, particularly where plaintiff points to no specific conduct by Dameron to support his general assertions. *Anderson*, 477 U.S. at 248 ("Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment."); Fed. R. Civ. P. 56(c) (requiring a party opposing summary judgment to support any claim of a disputed fact by citing to particular parts of material in the record).

Hall's disappointment and frustration with the results of his treatment and the length of time he has been suffering from the scalp condition are certainly understandable. The symptoms of his condition sound unpleasant and painful. But the fact that a favorable outcome does not result from medical treatment does not give rise to a constitutional violation. *Jackson v. Lightsey*, 775 F.3d 170, 178–79 (4th Cir. 2014) (explaining that neither medical negligence nor a disagreement between an inmate and a medical provider over the proper medical care is sufficient to show deliberate indifference for constitutional purposes); *see also Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985) (holding that plaintiff's claim that the medical treatment he received was unsuccessful was not sufficient to establish an Eighth Amendment violation); *Odom v. S.C.D.C. Transp. FNU LNU*, No. 3:06-3417-PMD-JRM, 2007 WL 3-34889, at *4 (D.S.C. Oct. 15, 2007) (explaining that the "allegedly ineffective" medical care the plaintiff received, "while unfortunate, does not raise an issue of constitutional proportions"). This principle is particularly important here, where various statements in the medical records suggest that this particular disease is not easily treated. Indeed, the plastic surgeon described plaintiff's scalp condition as a disease that is "difficult to manage," "tends to be recalcitrant," and is "difficult to completely eradicate." (Med. R. 172.) Hall also has comorbidities which have complicated his treatment. Notably, though, the medical records reflect repeated efforts by Hall's medical providers—both inside and outside the prison—to find a treatment that works for him, given those comorbidities. Surgery was explored, but no surgeon considered it currently viable, without first pursuing less invasive treatment options. And, as already discussed, Dameron's conduct, in particular, certainly does not reflect deliberate indifference.

## C. Supervisory Liability

To the extent Hall's reference to Dameron's "agents and employees" reflects an attempt

11

to hold Dameron liable under a theory of supervisor liability, such a claim fails. "[S]upervisory officials may be held liable in certain circumstances for the constitutional injuries inflicted by their subordinates." *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984) (citation omitted). "Liability in this context is not premised on respondeat superior, but on a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care." *Id.*

"In order to succeed on a § 1983 claim for supervisory liability, a plaintiff must show: (1) that the supervisor had actual or constructive knowledge that [a] subordinate was engaged in conduct that posed 'a pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show 'deliberate indifference to or tacit authorization of the alleged offensive practices,'; and (3) that there was an 'affirmative causal link' between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff." *Wilkins v. Montgomery*, 751 F.3d 214, 226 (4th Cir. 2014) (quoting *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994)).

"As to the first element, '[e]stablishing a 'pervasive' and 'unreasonable' risk of harm requires evidence that the conduct is widespread, or at least has been used on several different occasions and that the conduct engaged in by the subordinate poses an unreasonable risk of harm of constitutional injury.'" *Id.* (alteration in original). "As to the second element, a plaintiff 'may establish deliberate indifference by demonstrating a supervisor's continued inaction in the face of documented widespread abuses." *Id.* "'Ordinarily, a plaintiff cannot satisfy his burden of proof by pointing to a single incident or isolated incidents,' for a supervisor cannot be expected to promulgate rules and procedures covering every conceivable occurrence within the area of his responsibilities." *Slakan*, 737 F.3d at 372 (quoting *Orpiano*, 632 F.2d at 1101). "Finally, as to

12

the third element, 'proof of causation may be direct . . . where the policy commands the injury of which the plaintiff complains . . . or may be supplied by the tort principle that holds a person liable for the natural consequences of his actions.'" *Id.* at 226–27. The causation requirement in a supervisory liability case "is a stringent one," requiring proof that the challenged action was "'the moving force' behind the ultimate violation." *Jones v. Wellham*, 104 F.3d 620, 627 (4th Cir. 1997) (quoting *Polk County v. Dodson*, 454 U.S. 312, 326 (1981)).

Hall has wholly failed to allege facts that would plausibly support any of these three elements. He does not identify any subordinates or others who violated his constitutional rights, he has failed to allege a pervasive and widespread practice of deliberate indifference that in turn posed a pervasive and unreasonable risk of harm; and he has failed to allege any causal connection between any such practice and his alleged harm. Accordingly, Hall has failed to establish that Dameron could be held liable as a supervisor.

For all of these reasons, Dameron is entitled to summary judgment as to Hall's Eighth Amendment claim—the sole claim against her.[9]

---

[9] In his opposition to the summary judgment motion, Hall asserts that Dameron stopped plaintiff's transfer "allegedly due to schedule[d] medical appointments," but he contends that the "record verified" that the transfer was stopped due to "deception," and plaintiff filing his Section 1983 lawsuit. (Pl.'s Opp'n ¶ 15.) To the extent Hall is raising a retaliation claim, he did not plead one in his complaint. Moreover, I decline to construe his opposition as a motion to amend to add such a claim, because it would be futile to allow that amendment. In particular, Hall's conclusory assertion that Dameron denied his transfer as retaliation for filing a Section 1983 lawsuit is not sufficient to establish that her action, even assuming it could support a retaliation claim, was the result of retaliation. *See Adams v. Rice*, 40 F.3d 72, 74 (4th Cir. 1994) (summarily dismissing retaliation claim as insufficient because it consisted of merely conclusory allegations and no facts to show retaliatory motivation); *Cochran v. Morris*, 73 F.3d 1310, 1317 (4th Cir. 1996) (noting that courts must treat an inmate's claim of retaliation by prison officials "with skepticism"). It is also uncertain whether transfer to a different prison (or refusing to transfer) could constitute a sufficient adverse action to support a First Amendment claim. *See, e.g.*, *Hoye v. Gilmore*, 691 F. App'x 764, 765–66 (4th Cir. 2017) (affirming district court's dismissal of First Amendment retaliation claim and holding that a transfer to a different prison, even though it was further away from plaintiff's family, was not a sufficient adverse action to support a First Amendment retaliation claim). The *Hoye* court distinguished cases from other circuits where the adverse action was the transfer moved plaintiff a significant distance, to a "more dangerous section" of the prison, or to a segregated housing or lock-down unit." *Id.* Hall does not explain how a refusal to transfer him negatively affected him or why that refusal would tend to chill First Amendment speech.

## III. CONCLUSION

For the foregoing reasons, I will grant Dameron's motion for summary judgment, and deny all other pending motions as moot. An appropriate order will be entered.

**ENTER**: This 18th day of August 2020.

*/s/ Norman K. Moon*
NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE